FREMONT MILLING COMPANY, APPELLEE, v. CHICAGO & NORTHWESTERN RAILWAY COMPANY, APPELLANT.

FILED MAY 19, 1917.   No. 19526.

1. **Carriers:** TARIFF RATES: COMPLIANCE.  Both the shipper and the carrier are bound to comply with the published tariff rates, rules and regulations.  Erroneous statements of the carrier, or its agent, as to the same will not relieve either the shipper or the carrier from such obligation.  A construction placed upon the tariff or transit rules and regulations by defendant's agent or what defendant may have done in the way of refunding unearned freight rates paid in other cases is immaterial.

2. ———: MILLING IN TRANSIT RATES.  A milling in transit rate is an entirety, and must be accepted and carried out in its entirety or not at all.

3. ———: INTERSTATE SHIPMENTS: UNUSED TRANSIT CREDIT.  A shipper cannot maintain an action in the courts of this state for unused transit credit on shipments of grain made from various points in Nebraska, destined to points outside of Nebraska and to one point in Nebraska, where parts of each car were forwarded indiscriminately to the points of destination, and where the rules and regulations provided for in the published tariff rates, rules and regulations giving milling in transit privileges have not been complied with.

APPEAL. from the district court for Dodge county: FREDERICK W. BUTTON, JUDGE. · *Reversed and dismissed.*

*A. A. McLaughlin, Lyle Hubbard* and *Wymer Dressler,* for appellant.

*Courtright, Sidner & Lee, contra.*

CORNISH, J.

During the spring and summer of 1912, the plaintiff billed in car-load lots over defendant's lines, with milling in transit privileges at Fremont, grain from various points in this state to various points, all but one outside of the state, paying freight charges from point of shipment to point of destination. A part of each shipment, or its equivalent, in accordance with milling in transit rules, was afterwards forwarded to the points of destination. The remaining portion was not, leaving the plaintiff an unused portion of its milling in transit credits. Plaintiff's action is based on this unused credit for grain never forwarded. It sues to recover the difference between what would be the local rates on the unforwarded grain in carload lots to Fremont and the rates originally paid on this grain, or its equivalent. The defendant points out that in each case the plaintiff in its claim has segregated the unforwarded tonnage from the remainder of the shipment both in and out of Fremont; that by virtue of the milling in transit privilege plaintiff was permitted to ship the grain to Fremont, resume possession, mill at that point, and forward the produce to destination upon the through rate, which was less than the two local rates would have been. Defendant admits that plaintiff was entitled to have the product, after milling of each car, forwarded within the time and according to the rate regulations and tariff provisions governing such shipments and milling in transit privileges.

It appears that, under the regulations for such shipments, there was a time limit within which grain held in transit could be forwarded, or what is called transit credit could be used. If the grain was not tendered for shipment within the time, the right to ship or use the transit credit terminated and the credit forfeited. No such tender was made in this case.

The tariff rules and regulations governing shipments with milling in transit privileges go into great detail, and permit only the various products of the grain to be for-

warded, so that the equivalent in weight of the shrinkage and portion lost in milling, what is called invisible loss, is not permitted to be forwarded. They provide that an account shall be kept and settlement had before the time limit for forwarding, which was not done in the instant case.

The defendant contends that, inasmuch as the plaintiff has not brought itself within these tariff rules and regulations, no settlement being had or forwarding shipments tendered within the time required, it has forfeited its right to the transit credit, and cannot be refunded any freight paid. While the plaintiff agrees that tariff rates must govern, it insists that the railroad can charge for carriage only what it has earned, that it cannot ask more than the tariff rate for service actually rendered, and that no tariff rules or regulations are involved where freight is not carried.

We are of opinion that whatever equities might exist in favor of the plaintiff (we do not say whether any would exist), if its claim were being considered before a railway board of transportation, this court cannot afford it any relief.

The policy of railway legislation in recent years has been, not alone to pass laws commanding what is right and prohibiting what is wrong in the management of railroads, but to give over to the public the management itself, in so far as may be necessary to prevent the wrongs complained of, touching rates, discriminations, facilities, etc. The purpose is to have the public hand in touch with everything so that the law cannot be violated, even though both parties to the transaction wish it. Courts of law, where parties are presumed to be adverse, are not suited to that sort of work. Collusion, resulting in discrimination, was one of the main evils to be remedied.

Where the tariff rates and regulations are published, these become the law governing every party to the shipment, only to be varied from by leave of that administrative body known as the railway commission, which has

power, by general rules, equally available to all other shippers, to do what is equitable.  The railroad might resist a claim like this in court, but not do so in case of a favored shipper.  All shippers must be treated alike.

It follows that every shipper is bound to know just what the tariff rates, rules and regulations are, and that the parties can make no express contract in any way modifying or superseding them.  It follows, too, that the rights of parties cannot be altered by estoppel, as in case of private contracts.  All special arrangements between shipper and carrier are prohibited.

The transit credit in the instant case cannot be treated as if it represented a single shipment of grain to Fremont. Being made up of parts of car-load shipments to Fremont, the remaining portion of which was forwarded to points of destination, it must be treated as a part of shipments made with milling in transit privileges, under the published tariff rates, rules and regulations for interstate shipments, and, the same not having been complied with, the plaintiff is not entitled to any relief in courts of law.

The judgment of the trial court should be reversed and the cause dismissed.

REVERSED AND DISMISSED.

SEDGWICK, J., not sitting.