# R. E. MINTON, d/b/a REM TRUCKING COMPANY, v. GENERAL SHALE PRODUCTS CORP.— 371 S. W. (2d) 808.

Eastern Section. December 4, 1962.

Certiorari Denied by Supreme Court May 10, 1963.

Sanders & Moore, Kingsport, for plaintiff in error R. E. Minton d/b/a Rem Trucking Company.

Edwin O. Norris and Penn, Hunter, Smith & Davis, Kingsport, for defendant in error General Shale Products Corp.

COOPER, J. Plaintiff R. E. Minton d/b/a REM Trucking Company, a duly authorized motor vehicle contract carrier engaged in interstate commerce, brought this action against the defendant General Shale Corporation, a manufacturer and supplier of concrete and cinder blocks, brick, and other similar type products, seeking to recover $85,000.00 allegedly due for transporting defendant's products. The products were transported under contract between the plaintiff and defendant dated July 13, 1950, which provided that the plaintiff would haul all brick, and cinder and concrete blocks shipped by the defendant from Kingsport, Tennessee into 16 named counties in Kentucky and 6 counties in West Virginia. The charges to be paid by the defendant for this service were set out in a Schedule of Minimum Rates or Charges which was attached to and expressly made a part of the contract. The contract and rate schedule were filed with the Interstate Commerce Commission, were approved, and the plaintiff was authorized to operate in interstate commerce as a motor vehicle contract carrier.

In his declaration, the plaintiff alleged that he performed services for the defendant continuously from July 13, 1950 until the contract was terminated by the

defendant on June 21, 1958; that the defendant refused to pay the minimum transportation charges provided in the contract, but paid plaintiff only for the weight actually shipped.

The defendant, in its answer, denied that it was indebted to plaintiff for any undercharges on shipments transported by the plaintiff; that the contract between the parties provided that transportation charges would be computed on the basis of weight actually hauled, and that it had paid the plaintiff on this basis throughout the life of the contract without complaint by the plaintiff. Defendant also relied on the defenses of equitable estoppel, laches and the Statute of Limitations.

By agreement of the parties, the Court heard the case without the intervention of a jury—it being understood that if the issues were decided in favor of the plaintiff, an accounting would then be had to determine the amount of undercharges. After hearing the evidence, the Court took the matter under advisement and later, without making a finding of fact or giving the basis for its holding, rendered a judgment in favor of the defendant.

As the trial court made no finding of fact, the plaintiff took the position that all issues made by the pleadings were decided in favor of the defendant and filed assignments of error insisting, in substance, that the trial court erred (1) in interpreting the contract between the parties in accordance with the insistence of the defendant; and (2) in applying the equitable doctrines of estoppel and laches to prevent recovery by the plaintiff.

Considering the first issue, the contract between the parties provides, with respect to the charges to be paid by the shipper-defendant, that:

"2. The Shipper agrees to pay to the Carrier as compensation for such transportation the rates or charges shown in the Table of Rates attached hereto * * * as Exhibit ''A''. [Exhibit ''A'' was a Schedule of Minimum Rates or Charges from Kingsport, Tennessee to points in Kentucky and West Virginia].

\* \* \* \* \*

"5. Any shipments in excess of the minimum amount herein specified, which shall be tendered by the Shipper to the carrier, will be accepted by the Carrier for transportation up to the capacity of his equipment, and charges for such excess shipments shall be at the rate herein specified."

Rule 2 of the Schedule of Minimum Rates or Charges attached to the Contract as exhibit ''A'', provides:

> "*Minimum Weight.* Minimum rates or charges named in this schedule are applicable on truckloads of 24,000 pounds or more. Any shipment of less than 24,000 pounds will be charged for at applicable rate, computed on weight of 24,000 pounds.
>
> "In applying the provisions of this rule, the following estimated weights shall be used.

| | | |
|---|---|---|
| "8x8x16 Cinder Blocks | — | 27,650 pounds per thousand |
| 6x8x16 Cinder Blocks | — | 19,950 pounds per thousand |
| 4x8x16 Cinder Blocks | — | 16,250 pounds per thousand |
| F H A Cinder Blocks | — | 38,000 pounds per thousand |
| 12x8x16 Cinder Blocks | — | 38,170 pounds per thousand |
| 8x8x16 Concrete Blocks | — | 40,120 pounds per thousand |
| Standard Brick Stacked | — | 4,490 pounds per thousand |
| Oversize Brick Stacked | — | 5,510 pounds per thousand |
| Double Common Brick | — | 7,640 pounds per thousand |
| 8" Speedbrik | — | 12,960 pounds per thousand |
| 6" Speedbrik | — | 10,060 pounds per thousand |
| 4" Speedbrik | — | 8,300 pounds per thousand" |

The Table of Rates on page 3 of Exhibit ''A'' sets out the agreed cost of carrying 1000 of each commodity

listed in Rule 2 above for varying distances. A part of the schedule is set out below for clarification:

"TABLE OF RATES

"IN DOLLARS AND CENTS PER THOUSAND BLOCKS

| "Rate per thousand Blocks | 8x8x16 | 6x8x16 | 4x8x16 | F H A Cinder 12x8x16 Concrete 12x8x16 Cinder |
|---|---|---|---|---|
| *** | *** | *** | *** | *** |
| 41 to 44 miles | 32.50 | 25.00 | 20.00 | 47.00 |
| 45 to 49 miles | 35.00 | 27.00 | 22.00 | 50.00 |
| 50 to 54 miles | 37.50 | 29.00 | 23.00 | 53.00 |
| *** | *** | *** | *** | *** |
| 150 to 109 miles | 55.00 | 42.00 | 35.00 | 78.00 |
| 110 to 114 miles | 57.50 | 44.00 | 36.00 | 82.00 |
| 115 to 119 miles | 60.00 | 46.00 | 38.00 | 87.00 |
| *** | *** | *** | *** | *** |

"BRICK

| "Rate per thousand brick | Standard Stacked | Oversize Stacked | Double Commons | 8" Speedbrik | 6" Speedbrik | 4" Speedbrik |
|---|---|---|---|---|---|---|
| *** | *** | *** | *** | *** | *** | *** |
| 41 to 55 miles | 7.00 | 8.50 | 12.00 | 19.00 | 17.00 | 12.00 |
| 56 to 70 miles | 8.00 | 9.50 | 14.00 | 22.00 | 19.00 | 14.00 |
| 71 to 85 miles | 9.00 | 11.00 | 16.00 | 25.00 | 22.00 | 16.00 |
| 86 to 100 miles | 10.00 | 12.00 | 18.00 | 28.00 | 24.00 | 18.00 |

■■ Rate schedules and tariffs, required to be filed with the Interstate Commerce Commission are to be construed fairly and reasonably and in accordance with the common meaning of the words used. Union Transfer Co. v. Renstrom, 151 Neb. 326, 37 N. W. (2d) 383; American Railway Express Co. v. Price Bros., 5 Cir., 54 F. (2d) 67. Following this admonition and finding that the Schedule of Minimum Rates or Charges in this case contains no words with peculiar trade usage or meaning, we think the language of Rule 2 set out above is susceptible to only one construction—that is, Rule 2 fixes the *mini-*

*mum weight* to be used in determining charges for any and all shipments carried by the plaintiff under his contract with the defendant, and provides that if the defendant elects to make a shipment of less than 24,000 pounds, it would have to pay the same charge as it would pay for a shipment of 24,000 pounds. Where the weight of the shipment is in excess of the minimum weight of 24,000 pounds, the defendant would pay for this excess. (See paragraph 5 of the contract set out above).

It is argued by the defendant that if the above construction is correct, "then the second sentence in Rule 2: "Any shipment of less than 24,000 pounds will be charged for at applicable rates computed on weight of 24,000 pounds', would be absolutely superfluous and redundant." We do not agree. Defendant's contention would be true only if the rates schedule was in "Dollars and Cents per 24,000 pounds" rather than in "Dollars and Cents per Thousand Blocks or Bricks", as was the schedule in this case. Using the rate schedule in the present case, the determination of the cost of shipping 24,000 pounds of a commodity would necessitate a mathematical computation.

We are of the opinion, therefore, that the plaintiff is entitled to recover from the defendant the difference between the transportation charges actually paid by the defendant and the correct charges computed on the basis of a minimum shipment of 24,000 pounds, unless, as insisted by the defendant, the plaintiff is barred from recovery by laches or equitable estoppel.

 Can a motor contract carrier engage in interstate commerce be barred from recovering scheduled transportation charges by laches or equitable estoppel? Counsel

for neither party has referred us to a case where this precise question was considered, and we have been unable to find such a case. However, there are numerous reported decisions wherein the Courts have uniformly held that a common carrier engaged in interstate commerce, or a contract carrier engaged in intrastate commerce, cannot be estopped from collecting the full amount of his charges as provided in the carrier's tariff or schedule on file with the proper commission.

The Federal Motor Carrier Act makes it the duty of every common carrier, among other things, "to establish, observe, and enforce just and reasonable individual and joint rates, fares, and charges, * * *" 49 U.S.C.A. sec 316(a), and prohibits any deviation from the rates enumerated in the tariff "to make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, gateway, locality, region, district, territory, or description of traffic, in any respect whatsoever; * * *" 49 U.S.C.A. sec. 316(d).

It is also provided by the Act that it is the "duty of every contract carrier by motor vehicle to file with the Commission, publish, and keep open for public inspection * * * schedules containing the actual rates or charges of such carrier for the transportation of passengers or property in interstate or foreign commerce, * * *", and the Act expressly prohibits the contract carrier by motor vehicle from charging or collecting less compensation for such transportation than the charges filed with the Interstate Commerce Commission. 49 U.S.C.A. sec. 318 (a).

In considering the effect of the above provisions of the Federal Motor Carriers Act, the Federal courts have

repeatedly held that parties to a transportation agreement are bound by the published rates and the carrier is entitled to collect accordingly. In Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company v. Fink, 250 U.S. 577, 40 S.Ct. 27, 28, 63 L.Ed. 1151, the consignee of a shipment by freight paid the freight charges in accordance with the bill presented to him. There was a variance, however, between the amount paid and the filed rate. Quoting the provisions of the statute, the court in holding that plaintiff was entitled to recover the difference between the amount accepted by the carrier and the legal charge said, in part:

"It was, therefore, unlawful for the carrier upon delivering the merchandise consigned to Fink to depart from the tariff rates filed. The statute made it unlawful for the carrier to receive compensation less than the sum fixed by the tariff rates duly filed. Fink, as well as the carrier, must be presumed to know the law, and to have understood that the rate charged could lawfully be only the one fixed by the tariff. When the carrier turned over the goods to Fink upon a mistaken understanding of the rate legally chargeable, both it and the consignee undoubtedly acted upon the belief that the charges collected were those authorized by law. Under such circumstances consistently with the provisions of the Interstate Commerce Act the consignee was only entitled to the merchandise when he paid for the transportation thereof the amount specified as required by the statute. For the legal charges the carrier had a lien upon the goods, and this lien could be discharged and the consignee become entitled to the goods only upon tender or payment of this rate. Texas & Pacific Ry.

Co. v. Mugg [& Dryden], 202 U.S. 242, 26 S.Ct. 628, 50 L.Ed. 1011. The transaction, in the light of the act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge or the consignee the right to pay. This may be in the present as well as some other cases a hardship upon the consignee due to the fact that he paid all that was demanded when the freight was delivered; but instances of individual hardship cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation.''

See also New York Central & Hudson River Railroad Company v. York & Whitney Company, 256 U.S. 406, 41 S.Ct. 509, 519, 65 L.Ed. 1016.

In Baldwin v. Scott County Milling Co., 307 U.S. 478, 485, 59 S.Ct. 943 948, 83 L.Ed. 1409, the court said:

''* * * equitable considerations may not serve to justify failure of carrier to collect or retention, by shipper of, any part of lawful tariff charges.''

Of like import are Louisville & Nashville Railroad Co. v. Central Iron & Coal Co., 265 U.S. 59, 44 S.Ct. 441, 68, L.Ed. 900; Garrison Coal Co. v. Hines, 118 Okl. 251, 247 P. 62, 64, 46 A. L. R. 1151; Union Transfer Co. v. Renstrom, 151 Neb. 326, 37 N.W. (2d) 383; Steele v. General Mills, 329 U.S. 433, 67 S.Ct. 439, 91 L.Ed. 402.

In Johnston v. L. B. Hartz Stores, Inc., 202 Minn. 132, 277 N. W. 414, 416, the plaintiff brought action to recover the difference between what it had been paid as a carrier for transporting goods for the defendant, under the

terms of a contract between the parties, and the minimum rate for such transportation as fixed by the Railroad and Warehouse Commission of the State. After discussing the provisions of the State statute with reference to transportation rates, the Court stated:

"Under the Interstate Commerce Act, common carriers are permitted to recover undercharges, although the language of that act is not quite so strong as is section 8 of chapter 170, and although there is no specific provision for the recovery of undercharges. See paragraph 7 of section 6 of chapter 1 of title 49 U.S.C.A. p. 283. It is quite true that the purposes underlying the regulation, of common carriers are primarily the establishment of reasonable rates and the prevention of discrimination, but in order to effectuate such purposes it becomes necessary to render contracts for any other rate nugatory and to treat the contract for carriage as one for the established rate and permit a recovery for an undercharge. Obviously, the permitting of such a recovery is a much more effective way of enforcing the law than any other could possibly be. *The same is true of the contract carrier act.* Fines and penalties might be imposed, but the pressure of the shippers upon the carriers for reduced rates in violation of the statute will almost entirely be relieved if the shippers know that notwithstanding any illegal bargain that is made, recovery may still be had on the basis of the minimum rate fixed by the commission. Collusion between the carrier and the shipper to circumvent the law which would otherwise be easy of accomplishment, will be practically eliminated. All these considerations apply with equal force to the mainte-

nance of the contract carrier rates fixed by the commission. * * *''

See also Hawley v. Little Falls Mill & Merchantile Co., 20 Minn. 165, 19 N. W. (2d) 161, 162.

In Hughes Transportation, Inc. v. United States, 121 F. Supp. 212, 128 Ct.Cl. 221, the plaintiff, a contract carrier engaged in intrastate commerce, brought suit to recover the difference between the amount of freight charges paid by the United States (as shipper) and the amounts allegedly due under Kentucky intrastate tariffs. In considering the application of the principles of estoppel to prevent the recovery of freight charges, the Court stated, 121 F. Supp. at page 235, that:

"Ordinary principles of estoppel do not apply to a carrier's right to collect the approved published tariff rate even in cases where the carrier has knowingly quoted an illegally low rate and the shipper, in this case through an authorized contracting officer, has innocently relied on such quotation, without inquiry or investigation, to its later detriment."

█ It is apparent from the above authorities, and from a reading the Federal Motor Carrier Act in its entirety (49 U.S.C.A. sec. 301 et seq.), that the purpose underlying the regulation of transportation by motor carriers is to develop and preserve a highway transportation system properly adapted to the needs of the commerce of the United States. To accomplish this purpose, it is necessary to see that motor carriers, whether common carriers or contract carriers, are paid reasonable rates for transporting passengers or property, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices. See 37

Am. Jur., Motor Transportation, Sec. 109, p. 581. To that end agreements between shippers and motor carriers for the payment of rates varying from those provided in the tariffs or schedules of charges filed with the Interstate Commerce Commission cannot be recognized nor allowed, nor can any act or omission of the carrier (except the running of the applicable statute of limitations) be permitted to estop or preclude it from enforcing payment of the full amount of transportation charges. See Louisville & Nashville Railroad Co. v. Central Iron & Coal Co., 265 U.S. 59, 44 S.Ct. 441, 68 L.Ed. 900.

In accordance with the above authorities, we are constrained to hold that the equitable defenses of laches and estoppel are not available to the defendant to defeat its liability for payment of the charges due for the transporting of its products under the Contract and Schedule of Minimum Rates or Charges filed with, and approved by, the Interstate Commerce Commission.

Accordingly, the judgment of the trial court is reversed and the cause is remanded for an accounting to determine the total amount of undercharges due the plaintiff.

■ Both parties have pointed out in their briefs that the defendant is insisting that the two-year limitation provided in Sec. 304a. Title 49 U.S.C.A. is applicable in this case. We feel that a determination of this issue is necessary and proper in order to fix the period to which the accounting should be limited.

Sec. 304a provides:

"(1) *All actions at law by common carriers* by motor vehicle subject to this chapter for the recovery of

their charges, or any part thereof, shall be begun within two years from the time the cause of action accrues and not after.'' (emphasis supplied)

[Note: The amendment providing for a three year limitation became effective after the contract between the parties was terminated.]

As indicated by the italics, the limitation in Section 304a applies only to actions by motor vehicle common carriers. Counsel for defendant insists, however, that the legislative history of the Act as recorded in U. S. Code Congressional Service (1949), pages 1429-1430, indicates that Congress intended to establish one uniform statute of limitations period affecting all interstate carriers, including contract carriers. Counsel frankly admits that he has been unable to find a decision of any court which upheld his contention and applied the two-year limitation to suits for transportation charges brought by contract carriers, but argues tht the decision in the case of Bottemueller v. Wilson & Co., D.C., 57 F. Supp. 766 appeared to support his contention. We do not agree. In the Bottemueller case, which was decided before Congress passed Sec. 304a, the plaintiff, a contract motor carrier engaged in interstate commerce, brought suit against a shipper to recover the difference between the transportation charges set out in the contract and the published schedules. The defendant moved for a summary judgment on the ground that the action was barred by the three year limitation placed by the State of Kansas, where the obligation originated, on liabilities created by statute. In denying the motion, the court stated:

"* * * the plaintiff in this case was within his rights to sue on the contract. He has done that. It was his contract and not the statute which created the liability. It was the hauling service that he performed for the defendant and not the statute which gave him the right to claim compensation. All the statute did was to regulate and fix the amount of compensation to be charged and to forbid the plaintiff from collecting a lesser amount."

We have read the legislative history referred to by the defendant and were unable to find any indication that the Congress intended to do more than to establish a uniform statute of limitations for all *common* carriers by motor vehicles, *common* carriers by water, and freight forwarders, who were also common carriers. Contract carriers were not referred to in a single instance.

We are of the opinion that the language of Section 304a clearly restricts the application of the two year limitation to actions to recover charges by common carriers, not to such actions brought by contract motor carriers engaged in interstate commerce. Further, that in the absence of a limitation on actions by contract motor carriers, the limitation on actions growing out of contracts in the state where the obligation originated is controlling. In the present case, that limitation is 6 years after the cause of action accrued. See T.C.A. sec. 28-309. Transportation charges accrue when the transportation services are rendered and the statute of limitations on such charges runs from that date. United States v. Wilder, 13 Wall. 254, 80 U.S. 254, 20 L.Ed. 681; Southern Pacific Co. v. United States, 67 Ct.Cl. 414, 422, certiorari denied 280 U.S. 567, 50 S.Ct. 26, 74 L. Ed. 620; Hughes

Transportation, Inc. v. United States, D.C., 109 F. Supp. 373. Plaintiff's suit was instituted on January 12, 1959. Accordingly, we hold that the period to be covered by the accounting on remand is from January 12, 1953 to January 12, 1959.

Costs of the appeal are adjudged against the defendant General Shale Products Corporation.

McAmis, P. J., and Avery, (P. J., W. S.), concurs.