ROBERT McDANIEL TRUCKING CO., INC., *v.* OAK CONSTRUCTION COMPANY.

1. CARRIERS—MOTOR CARRIERS—CONTRACTS—RATES—VIOLATION OF STATUTE.

Agreement whereby defendant consignee was to receive transportation service at a lower rate than as prescribed by order of the public service commission and plaintiff common motor carrier's tariff filed pursuant thereto, was made in violation to the motor carrier act (CL 1948, §§ 476.6–476.8).

2. SAME—CONTRACTS—RATES.

A consignee and a common motor carrier have a right to contract for the rendition of hauling service by the latter but the parties are precluded by statute from fixing rates at variance with those prescribed pursuant to statute (CL 1948, §§ 476.6–476.8).

REFERENCES FOR POINTS IN HEADNOTES

[1, 2]  9 Am Jur, Carriers § 155.
[3, 6]  9 Am Jur, Carriers § 158.
[4, 8]  9 Am Jur, Carriers § 160.
[5]  9 Am Jur, Carriers § 164.
[7]  37 Am Jur, Motor Transportation § 17.
[9]  9 Am Jur, Carriers §§ 158, 633.

3. Same—Rates—Collection—Discrimination.

A common motor carrier has the statutory duty to charge and collect rates in accordance with the order of the public service commission and the published tariffs notwithstanding an agreement with a consignee to furnish transportation service at a lower rate, since to deny recovery for the difference would result in discrimination forbidden by statute for the protection of the public generally (CL 1948, §§ 476.6–476.8).

4. Same—Misstatement of Rates.

Neither the intentional nor accidental misstatement of the applicable published rate will bind the common motor carrier or party for whom transportation service is performed as there may be but one rate open to all alike and from which there may be no departure (CL 1948, §§ 476.6–476.8).

5. Same—Rates—Contracts—Estoppel.

An illegal agreement by a common motor carrier to charge a consignee less than amount required by order of public service commission and tariffs published pursuant thereto does not estop the carrier from collecting the undercharge (CL 1948, §§ 476.6–476.8).

6. Same — Rates — Illegal Contracts — Discrimination — Public Policy.

The general rule that parties to an illegal contract will be left by the courts where they find themselves does not apply to a contract for transportation service by a common motor carrier to charge less than rate prescribed by order of public service commission and published tariffs, since it is mandatory that the parties conform to statute in order to protect the public from prohibited discrimination (CL 1948, §§ 476.6–476.8).

7. Same—Rates—Construction of Statutes—Intent.

It was the legislative intent of the motor carrier act to take from the common motor carrier and the shippers or consignees the right to provide by private contract for a charge for transportation service at a lesser amount than the minimum provided by order of the public service commission and tariffs published pursuant thereto (CL 1948, §§ 476.6–476.8).

8. Same—Discrimination—Mistake—Contracts.

A discrimination in favor of or against a shipper or consignee by a common motor carrier cannot be justified, either by mistake or agreement.

9. SAME—CONTRACTS—STATUTES.

The public welfare will be best served by accepting the doctrine that shippers and common motor carriers entering into agreements for transportation services shall be deemed to have made the kind and character of contract permitted by the statute regulating such transaction (CL 1948, §§ 476.6–476.8).

Appeal from Oakland; Doty (Frank L.), J. Submitted January 14, 1960. (Docket No. 73, Calendar No. 48,369.) Decided April 12, 1960.

Action by Robert McDaniel Trucking Co., Inc., a Michigan corporation, against Oak Construction Company, a Michigan corporation, to recover difference in transportation charges between contract price and rates fixed by Michigan public service commission. Judgment for defendant. Plaintiff appeals. Reversed and remanded.

*Wilber M. Brucker, Jr.,* for plaintiff.

*Burke & Osgood* (*John B. Osgood,* of counsel), for defendant.

*Amicus curiae:*

*William B. Elmer* (*Sullivan, Elmer, Eames & Moody,* of counsel), for Aggregates Carriers of Michigan, Inc.

CARR, J. The facts and issues in this case were stipulated in circuit court and the cause submitted to the trial judge for determination. During the summer of 1958 and for some time prior thereto plaintiff was engaged in the business of hauling sand and gravel as a common carrier under a certificate of authority issued to it by the Michigan public service commission. Under date of May 10, 1957, the commission by order specified minimum rates to be

charged by sand and gravel motor carriers. On June 14th following plaintiff caused to be published its tariff consistent with the minimum rates as prescribed. Such rates remained in force and effect during the period involved in this controversy.

At the time in question defendant was engaged in the construction of concrete pavement and work of similar character requiring the use of sand and gravel. In the conduct of its business it purchased materials from a supplier and procured the same to be hauled by truck to its yards. Prior to July 7, 1958, defendant had engaged plaintiff for the rendition of the hauling service, paying therefor at the rate set forth in the published tariff. On the date mentioned defendant advised plaintiff that it was in position to obtain a delivered price for sand and gravel which was lower than the combined prices being paid by it to its supplier and the tariff rate that had been paid to plaintiff. The result was an agreement between the parties whereby plaintiff contracted to haul sand and gravel, as a common carrier, for defendant at the rate of 46 cents per 1,000 pounds for delivery in Royal Oak township, Oakland county. Such rate was below the published rate for such service and in violation of the order of the public service commission.

During the period from July 7, 1958, to October 20th following plaintiff hauled substantial quantities of sand and gravel for defendant at the contracted rate. Such charges were paid in full. On complaints made to it the public service commission held a hearing with reference to the rates specified in its order of May 10, 1957, and issued warnings against violations of said order. Thereafter by agreement between plaintiff and defendant further hauling was done at the minimum rate as fixed by the commission's order and plaintiff's published tariff. Plaintiff then demanded payment for the difference be-

tween the rate fixed by the agreement of the parties and the prescribed minimum tariff rate. Defendant refused payment, claiming that it was not further obligated in view of the agreement of July 7, 1958. It is conceded that the difference between the tariff rate and the contract rate for the period when the latter was observed amounted to $15,986.70. It was stipulated in circuit court that if plaintiff prevailed in the action judgment should be entered for that amount.

In the submission to the trial court of the issue involved defendant contended that the contract between the parties for the transportation service at a rate lower than that fixed by the order of the public service commission and by plaintiff's tariff was illegal, that the contract was incapable of enforcement by either party, and that for such reason plaintiff was not entitled to recover. Reliance was placed on the general rule that where parties have entered into an illegal agreement, and are *in pari delicto,* the law will not aid either but will leave the parties in the position in which they have placed themselves. The trial judge concluded that the legal principle invoked was applicable and rendered judgment in favor of the defendant, without costs.

Plaintiff has appealed, contending in substance that the trial judge was in error in basing his decision on the principle referred to with reference to the granting of relief in any instance where parties have deliberately made an agreement in violation of the declared public policy of the State. The principle of law underlying the rule of nonintervention by the courts is not questioned, it being the position of plaintiff that under a situation of the character involved in the instant case such rule yields to the overriding proposition that the carrying out of the mandate imposed by statute requires that, irrespective of contractual undertakings, rates

of carriers shall be uniform, that discriminations in the form of rebates or otherwise are forbidden, and that the carrier not only has the right but also the duty to collect charges in accordance with the lawful rates prescribed.

In the motor carrier act of the State* the legislature has provided for the regulation of motor carriers operating on the public highways, and has vested the public service commission with specific authority with reference to rates and charges for services by such carriers. Sections 6, 7, and 8 of article 2 of said act (CL 1948, §§ 476.6–476.8 [Stat Ann §§ 22.539, 22.540, Stat Ann 1957 Cum Supp § 22.541]) are pertinent to this case and read as follows:

"Sec. 6. Publication and filing of rates. All common motor carriers subject to the provisions of this act, shall before engaging in business, print and file with the commission and keep open to public inspection in each of its depots and offices, schedules showing all rates, fares and charges for transportation of passengers and property between different points on its route, and also between points on its own route and on the route of any other common motor carrier when a through route and joint rate have been established. If no joint rate over the through route has been established the several carriers shall file, print and keep open for public inspection as aforesaid the separately established rates, fares and charges applied to the through transportation, and shall likewise print, file and keep open to the public inspection all other charges, or privileges or facilities, rules or regulations which in anywise change, affect or determine any part of the rates, fares, charges or the value of the service, and such other information as may be required by the commission in its rules and regulations. No common motor carrier shall receive or accept any person or property for trans-

---

* PA 1933, No 254, as amended (CL 1948, § 475.1 *et seq.*, as amended [Stat Ann § 22.531 *et seq.*, as amended.]).

portation upon the highways until the requirements
of this section have been complied with: Provided,
Nothing in this section or any other section of this
act contained shall be construed or held to require
the printing, publication or filing by any common
motor carrier of passengers, of any tariffs, rates,
fares or charges covering, controlling or affecting
the charter or special coach business of such carrier.

"Sec. 7. Reasonable rates without unjust discrim-
ination. All rates, fares and charges made by any
common motor carrier shall be just and reasonable,
and shall not be unjustly discriminatory, prejudicial
nor preferential. No such common motor carrier
shall charge, demand, collect or receive a greater or
less or different remuneration for the transportation
of passengers or property, or for any service in con-
nection therewith, than the rates, fares and charges
which have been legally established and filed with
the commission; nor shall any such common motor
carrier refund or remit in any manner or by any
device any portion of the rates, fares and charges
required to be collected by the tariffs on file with the
Michigan public utilities commission or ordered by
the commission.

"Sec. 8. Rebates unlawful. Any person, whether
carrier, shipper or consignee, or any officer, em-
ployee, agent or representative thereof, who shall
knowingly offer, grant or give, or solicit, accept or
receive any rebate, concession or discrimination in
violation of any provision of this act, or who, by
means of any false statement or representation, or
by the use of any false or fictitious bill, bill of lading,
receipt, voucher, roll, account, claim, certificate, affi-
davit, deposition, lease, or bill of sale, or by any
other means or device, shall knowingly and wilfully
assist, suffer or permit any person or persons, nat-
ural or artificial to obtain transportation of passen-
gers or property subject to this article 2 for less than
the applicable rate, fare or charge, or who shall
knowingly and wilfully, by any such means or other-

wise, fraudulently seek to evade or defeat regulations as in this act provided for common motor carriers, shall be deemed guilty of a misdemeanor, and, upon conviction shall be punished by a fine of not more than $100.00, or imprisonment for not more than 90 days, or both."

It is apparent from the sections quoted that the legislature had in mind the protection of the public interest by requiring the publication of rates to be charged by each common motor carrier, to prohibit discriminatory charges, to forbid the observance of rates other than as fixed pursuant to the statute, and to provide a penalty for the granting of rebates in any form and for discrimination forbidden by the act. In the instant case it is obvious, and is in fact conceded, that the agreement between the parties whereby defendant was to receive transportation service at a lower rate than as prescribed by order of the commission, and plaintiff's tariff filed pursuant thereto, was made in violation of the motor carrier act. The parties had the right to contract for the rendition of the hauling service desired by defendant but in doing so they were precluded from fixing rates at variance with those prescribed pursuant to the statute. It is this part of the undertaking as made that is tainted with illegality.

The observance of the mandate of the statute requires that the plaintiff motor carrier charge and collect rates in accordance with the order of the public service commission and the published tariff. To leave the parties where they have placed themselves by denying the right to so recover means as a practical proposition that defendant is relieved of the liability to pay the transportation charges in accordance with the law of the State. It would result in discrimination that for the protection of the public generally is forbidden by law. It would be tantamount to denying recovery of a rebate illegally paid.

It does not appear that this Court has heretofore passed on the precise question here involved. Counsel for plaintiff has, however, cited prior decisions, including *Grand Rapids & Indiana R. Co.* v. *Cobbs & Mitchell*, 203 Mich 133, and *Federal Gravel Co.* v. *Detroit & Mackinac R. Co.*, 248 Mich 49, as bearing on the underlying principle at issue. In other States and also in the Federal courts the question has arisen under statutory provisions analogous to those in the Michigan motor carrier act and under the interstate commerce act. Such decisions recognize the practical necessity of permitting a recovery of the rates fixed by law in order to obviate forbidden practices. In *Papetti* v. *Alicandro,* 317 Mass 382 (58 NE2d 155), the State statute involved forbade charging or collecting by motor carriers a different compensation for transportation service than as specified in the tariffs in effect at the time. Rebates were also expressly forbidden. There the plaintiff sought to recover the difference between the minimum rates fixed pursuant to the statute and the sum that he had been paid for the transportation of gasoline and fuel oil for the defendant. The trial court directed a verdict in favor of the defendant on the theory that the plaintiff was not entitled to recover under the averments of his declaration. In reversing the holding, the supreme court of the State said in part:

"Unless the plaintiff is prevented by some rule of law, he is entitled to maintain this action. We think that the plaintiff not only is not so barred, but that it is both his right and duty to recover the rebates. The provisions of G. L. (Ter. Ed.) c. 159B, as inserted by St. 1934, c. 264, and as revised by St. 1938, c. 483, bear resemblance respectively to the provisions of the interstate commerce act, USC (1940 ed), title 49, as to railroads, §§ 6, 2, 10, and as to common carriers by motor vehicle, §§ 316–327, the latter being

first enacted in 1935 (49 Stats 558–567). With respect to the former Federal enactment numerous decisions of the supreme court of the United States and of this court are authorities for the plaintiff. 'Neither the intentional nor accidental misstatement of the applicable published rate will bind the carrier or shipper. The lawful rate is that which the carrier must exact and that which the shipper must pay.' *Kansas City Southern R. Co.* v. *Carl,* 227 US 639, 653 (33 S Ct 391, 57 L ed 683). The 'effect of filing schedules of rates with the interstate commerce commission was to make the published rates binding upon shipper and carrier alike, thus making effectual the purpose of the act to have but one rate, open to all alike and from which there could be no departure.' *Boston & Maine Railroad* v. *Hooker,* 233 US 97, 112 (34 S Ct 526, 58 L ed 868, LRA 1915B, 450). 'The transaction between the parties amounted to an assumption by the consignee to pay the only lawful rate it had the right to pay or the carrier the right to charge. The consignee could not escape the liability imposed by law through any contract with the carrier.' " (Citing cases.)

Of like import is *Heuer Truck Lines* v. *Brownlee,* 239 Iowa 267 (31 NW2d 375). There the plaintiff, a common carrier by motor trucks, transported certain merchandise, pursuant to agreement, at a lesser rate than as fixed by its schedule of rates filed with the Iowa commerce commission. The trial court sustained the right of recovery on the basis that the plaintiff was required by law to make charges in accordance with the schedule filed, that any agreement to transport for a lesser charge was unlawful and void, that defendants had knowledge of the schedule of rates, and that any agreement between the parties for the rendition of service at a lower rate would constitute a preference to the defendants and an unlawful discrimination against others. The supreme court of the State affirmed

the conclusions of the trial court, holding specifically that the doctrine of estoppel could not be invoked to bar recovery. In this connection it was said (p 274):

"If there was an agreement between defendants and plaintiff, in order that the plaintiff be estopped, such agreement must necessarily be valid and enforceable. There was no such enforceable contract here, since it was contrary to the rates adopted and contrary to the rule that there should be no discrimination in favor of one, or preferential treatment. We agree with the court that there was no estoppel." (Citing cases.)

In view of the claim of the defendant in the case now before us the decision of the supreme court of Minnesota in *Johnston* v. *L. B. Hartz Stores, Inc.,* 202 Minn 132 (277 NW 414), is of interest. There the plaintiff brought action to recover the difference between what it had been paid as a carrier for transporting goods for the defendant and the minimum rate for such transportation as fixed by the railroad and warehouse commission of the State. There, as in the case at bar, the parties had undertaken to enter into a contract for the transportation of goods at a rate less than as prescribed. It was conceded that the contract was illegal, and the defendant contended that because of such illegality the parties were *in pari delicto* and that the courts should "leave the parties where they find themselves." After discussing the provisions of the State statute with reference to transportation rates, it was said (pp 134–136):

"Will it effectuate the purposes of the act to treat the contract as an ordinary illegal contract, where the courts normally leave the parties where they find themselves, or is the public policy behind the enforcement of the act paramount to the public policy usually applied to ordinary illegal contracts? Is it necessary that in order to effectuate the purposes

of the act we must permit a recovery of the undercharge? What was the legislative intent?

"The subject matter of the agreement insofar as it relates to the transportation of property is a perfectly legitimate subject of contract. It is only the agreement to carry at a lesser rate than the minimum prescribed by the commission that constitutes the illegal feature. There is no specific provision in c 170 that a carrier may recover such an undercharge, but we are asked to imply that right from the language of section 8 and the general purpose of the act as announced by the legislature.

"Under the interstate commerce act, common carriers are permitted to recover undercharges, although the language of that act is not quite so strong as is section 8 of c 170, and although there is no specific provision for the recovery of undercharges. See 49 USCA, § 6, par (7). It is quite true that the purposes underlying the regulation of common carriers are primarily the establishment of reasonable rates and the prevention of discrimination, but in order to effectuate such purposes it becomes necessary to render contracts for any other rate nugatory and to treat the contract for carriage as one for the established rate and permit a recovery for an undercharge. Obviously the permitting of such a recovery is a much more effective way of enforcing the law than any other could possibly be. The same is true of the contract carrier act. Fines and penalties might be imposed, but the pressure of the shippers upon the carriers for reduced rates in violation of the statute will almost entirely be relieved if the shippers know that notwithstanding any illegal bargain that is made recovery may still be had on the basis of the minimum rate fixed by the commission. Collusion between the carrier and the shipper to circumvent the law, which would otherwise be easy of accomplishment, will be practically eliminated. All these considerations apply with equal force to the maintenance of the contract carrier rates fixed by the commission. The conservation of the highway

and the safety of the public are just as dependent upon the maintenance of the contract carrier rates as the objects sought by the common carrier acts are dependent upon the maintenance of the rates fixed by the commission. In our opinion, the public welfare calls more imperatively for the enforcement of the former than the latter. It is paramount to any public policy which may be invoked to leave the parties where they find themselves. In our opinion, the minimum rates fixed by statute should be read into the contract as binding upon defendant, and there can be no estoppel by virtue of the agreement to take the illegal rate. *City of St. Paul* v. *Minnesota Transfer R. Co.*, 155 Minn 237, 240 (193 NW 175). The right of private contract at a lower rate has been taken from both the shipper and the carrier and the minimum rate substituted therefor. Such, in our opinion, was the legislative intent."

The above decision of the Minnesota court was cited and followed in *Hawley* v. *Little Falls Mill & Mercantile Co.*, 220 Minn 165, 168 (19 NW2d 161), where it was said:

"The law is well established that a contract carrier may bring action against a shipper to recover full freight charges as fixed by the State railroad and warehouse commission, notwithstanding an agreement between them to transport merchandise at a lower rate. While the carrier is equally guilty with the shipper in attempting to evade the law, nevertheless the carrier may recover any balance due, in accordance with the established rates. This is to deter and discourage agreements to carry freight at less than the lawful rates. Under such circumstances, as this court held in *Johnston* v. *L. B. Hartz Stores, Inc.*, 202 Minn 132 (277 NW 414), the contract between the carrier and the shipper becomes one for the minimum rate authorized by the commission, notwithstanding the agreement to the contrary. While ordinarily parties to an illegal agreement are left where the court finds them and

neither may recover from the other for violation of rights under such agreement, where freight rates are involved, since the public and other shippers are also concerned with enforcement of the law, the courts have permitted the carrier to recover the full rate, even though he be equally guilty with the shipper."

The Federal courts have repeatedly held in cases involving the application of the interstate commerce act that under the provisions thereof requiring the charging of rates by carriers in accordance with tariffs filed and in effect at the time, and forbidding rebates and discrimination in any form, parties to a transportation agreement are bound by the published rates and the carrier is entitled to collect accordingly. In *Pittsburgh, C., C. & St. L. R. Co.* v. *Fink,* 250 US 577 (40 S Ct 27, 63 L ed 1151), the consignee of a certain shipment by freight paid the freight charges in accordance with the bill presented to him. There was a variance, however, between the amount so paid and the filed rate. Quoting the provisions of the statute, the court in holding that plaintiff was entitled to recover the difference between the amount accepted by the carrier and the legal charge said, in part (pp 581, 582):

"It was, therefore, unlawful for the carrier upon delivering the merchandise consigned to Fink to depart from the tariff rates filed. The statute made it unlawful for the carrier to receive compensation less than the sum fixed by the tariff rates duly filed. Fink, as well as the carrier, must be presumed to know the law, and to have understood that the rate charged could lawfully be only the one fixed by the tariff. When the carrier turned over the goods to Fink upon a mistaken understanding of the rate legally chargeable, both it and the consignee undoubtedly acted upon the belief that the charges collected were those authorized by law. Under such circumstances consistently with the provisions of the

interstate commerce act the consignee was only entitled to the merchandise when he paid for the transportation thereof the amount specified as required by the statute. For the legal charges the carrier had a lien upon the goods, and this lien could be discharged and the consignee become entitled to the goods only upon tender or payment of this rate. *Texas & Pacific R. Co.* v. *Mugg,* 202 US 242 (26 S Ct 628, 50 L ed 1011). The transaction, in the light of the act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge or the consignee the right to pay. This may be in the present as well as some other cases a hardship upon the consignee due to the fact that he paid all that was demanded when the freight was delivered; but instances of individual hardship cannot change the policy which Congress has embodied in the statute in order to secure uniformity in charges for transportation."

The above decision was followed in *New York Central & Hudson River R. Co.* v. *York & Whitney Company,* 256 US 406 (41 S Ct 509, 65 L ed 1016), where it was said:

"We think the doctrine announced in *Pittsburgh, C., C. & St. L. R. Co.* v. *Fink,* 250 US 577 (40 S Ct 27, 63 L ed 1151), is controlling, and that the liability of York & Whitney Company was a question of law. The transaction between the parties amounted to an assumption by the consignee to pay the only lawful rate it had the right to pay or the carrier the right to charge. The consignee could not escape the liability imposed by law through any contract with the carrier."

In *Louisville & Nashville R. Co.* v. *Central Iron & Coal Company,* 265 US 59 (44 S Ct 441, 68 L ed 900), the plaintiff carrier sought to recover the difference between the amount that it had accepted in payment of freight charges and the amount fixed by the tariff on file with the interstate commerce

commission.   Citing the prior decisions above discussed, it was said (p 65):

"The shipment being an interstate one, the freight rate was that stated in the tariff filed with the interstate commerce commission.   The amount of the freight charges legally payable was determined by applying this tariff rate to the actual weight.   Thus, they were fixed by law.   No contract of the carrier could reduce the amount legally payable; or release from liability a shipper who had assumed an obligation to pay the charges.   Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the full amount by a person liable therefor."

Of like import are *Louisville & Nashville R. Co.* v. *Williamson* (CCA 5), 87 F2d 34; *New York Central R. Co.* v. *Transamerican Petroleum Corporation* (CCA 7), 108 F2d 994 (129 ALR 206); *Pennsylvania R. Co.* v. *Cameron,* 280 Pa 458 (124 A 638, 33 ALR 1281); *Garrison Coal Co.* v. *Hinds, Director Gen. of R. R.,* 118 Okla 251 (247 P 62, 46 ALR 1151).   In the Oklahoma Case the action was brought against the defendant Coal Company to recover additional charges in accordance with its liability under the tariff filed with the interstate commerce commission.   The defendant claimed that it had accepted and paid a voucher covering charges on the shipments in question on which voucher there was a notation to the effect that it was "in full settlement."   In rejecting the defense, it was said (p 254):

"The effect of the acceptance of the voucher was to operate as a satisfaction of that portion of the indebtedness, as created by the tariff, equal to the sum of money received from the voucher.   The carrier's acceptance of a payment for freight and demurrage charges, less than the amount due according to the rates and charges prescribed by the tariff,

does not operate as a satisfaction for a greater charge than the amount of the payment. A payment of a less sum of money than the amount of charges as fixed by the tariff would not operate to satisfy fully the indebtedness, even though the consignee and carrier intended the less payment to be full payment of the charges. The rate laws were enacted and the tariff rates created and established for the purpose of preventing discrimination in favor of or against consignees and shippers. A discrimination in favor of or against a shipper or consignee cannot be justified, either by mistake or agreement. The carrier is obligated to charge for services and receive compensation for such services according to the published tariff rates, and the consignees and shippers must pay for such services according to the prescribed rates. Mistake or agreement will not relieve the parties from such obligations." (Citing cases.)

The intent of the legislature in the enactment of the provisions of the motor carrier act here involved is clear. It was sought to protect the public against discrimination by carriers and to insure uniform rates for transportation services. To that end agreements between shippers and motor carriers for the payment of rates varying from those prescribed by the public service commission and set forth in the tariff of each carrier as filed with the commission were barred. The accomplishment of the purpose sought requires that a carrier operating under a State certificate must charge and must collect the rates fixed in accordance with the law.

We are not dealing here with an ordinary type of contract between individuals but with a matter affecting the public generally. The claim of the defendant that the parties must be left where they have placed themselves pursuant to the principle commonly recognized in cases involving ordinary illegal contracts may not be accepted. Such princi-

ple must yield to the rule of public policy that the courts in the decisions above cited, and in other decisions of like nature, have recognized as paramount. The public welfare will be best served by accepting the doctrine that shippers and motor carriers entering into agreements for transportation services shall be deemed to have made the kind and character of contract permitted by the statute regulating such transaction.

The judgment of the circuit court is reversed, and the case remanded with directions to enter judgment pursuant to the stipulation of the parties and in the amount therein set forth. Plaintiff may have costs of this appeal.

Dethmers, C. J., and Kelly, Smith, Black, Edwards, Kavanagh, and Souris, JJ., concurred.